*04RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0106p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SOLVAY PHARMACEUTICALS, INC.,

*Plaintiff-Appellee,*

No. 04-4381

*v.*

DURAMED PHARMACEUTICALS, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 04-00414—Herman J. Weber, District Judge.

Argued: October 25, 2005

Decided and Filed: March 22, 2006

Before: RYAN, GILMAN, and COOK, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Kenneth W. Starr, KIRKLAND & ELLIS LLP, Los Angeles, California, for Appellant.
James D. Robenalt, THOMPSON HINE LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:**
Christopher Landau, Pasquale Cipollone, Thomas D. Yannucci, KIRKLAND & ELLIS,
Washington, D.C., James E. Burke III, R. Patrick DeWine, KEATING, MUETHING & KLEKAMP,
Cincinnati, Ohio, for Appellant. James D. Robenalt, Michael L. Hardy, Brian J. Lamb,
THOMPSON HINE LLP, Cleveland, Ohio, Earle Jay Maiman, THOMPSON HINE LLP,
Cincinnati, Ohio, for Appellee.

_____

**OPINION**

_____

COOK, Circuit Judge. Duramed Pharmaceuticals appeals a decision of the district court
confirming a $68 million arbitration award against it in favor of Solvay Pharmaceuticals. We affirm.

I

In October 1999, Solvay Pharmaceuticals, Inc., ("Solvay") and Duramed Pharmaceuticals,
Inc., ("Duramed") executed a series of related agreements, laying the groundwork for what each
hoped would be a long relationship between the two companies. In one agreement, central to this
case, Solvay contracted to use its sales force to market a new menopause drug developed by
Duramed called Cenestin. In another, Duramed agreed to use its sales force to market two of

Solvay's women's health drugs, Estratest and Promentrium. And in a third, Duramed contracted to provide technical services to Solvay to assist in its reformulation of another drug, Estratab.

The Cenestin Co-Promotion Agreement ("CPA") had several key provisions. It provided that Solvay's services, rather than cash, would serve as consideration for Duramed's services under the related agreements. If, however, the CPA expired as scheduled, or if the parties failed to negotiate a long-term agreement and one of the parties terminated the CPA thereafter, the CPA required Duramed to pay Solvay a "residual payment," equal to 5% of Cenestin's gross margin in the final quarter of the CPA, every quarter for the next five years. The CPA was set to expire on December 31, 2000 unless the parties agreed to shorten or lengthen the term or one party terminated the agreement. And most crucially, Section 13.10, the "exclusive remedy/no damages" provision, provided:

> Termination by one party shall be the exclusive remedy for a default by the other party under this AGREEMENT [the CPA] and, except as expressly provided herein, neither party shall have any liability for damages to or lost profits of the other, direct or consequential.

The CPA also included a broad arbitration clause, Section 22.1, covering "[a]ny dispute, controversy, or claim arising out of or relating to [the agreement]."

Things did not go as planned. Duramed's financial condition deteriorated such that it could not afford to pay its sales force to market its drug or Solvay's drugs. And in January 2000, one of Duramed's creditors threatened to file a multi-million dollar cognovit judgment. Duramed sought Solvay's assistance. The parties reached a multi-part solution and memorialized it in a seven-page, January 27, 2000 letter signed by both parties. Duramed refers to this untitled letter as a "Letter of Amendment," hoping (for reasons discussed below) to emphasize its continuity with the CPA. Solvay calls it a "Letter Agreement," suggesting that it is an independent agreement. For ease of reference, we will refer to it as the "Letter Agreement."

The Letter Agreement provided first that Solvay would guarantee a $20 million loan to Duramed by Merrill Lynch Business Financial Services, Inc., and second that Solvay and Duramed would "extend[] and enhance[] [their] alliance with respect to the co-promotion of Cenestin."[1] Specifically, the agreement lengthened the term of the CPA to ten years, required Solvay to pay additional marketing expenses (including the cost of Duramed's contract sales force for Cenestin), and provided for a shifting profit-sharing arrangement whereby: (1) Solvay would receive 80% of Cenestin's gross profits (and Duramed 20%) until Solvay recovered its investment in marketing expenses required by the Letter Agreement; (2) Duramed would then receive 80% of the profits (and Solvay 20%) until Duramed recovered the "Duramed 1999 Cenestin Investment" of $38 million; and (3) the parties would thereafter split Cenestin's profits fifty-fifty. (The Letter Agreement referred to stages (1) and (2) as the "Investment Recovery Phase.") The Letter Agreement contained no provision for termination without cause and no exclusive remedy/no damages provision, but likewise it contained no provision providing for damages upon termination and no additional arbitration clause.

In the two years following the execution of the Letter Agreement, Solvay spent nearly $100 million to promote Cenestin, but sales continued to lag. An April 2001 internal assessment at Solvay reported that the arrangement with Duramed was "not profitable" and concluded that "a decision must be made" whether to "terminate the relationship." Meanwhile Duramed, which was

---

[1]The Letter Agreement provided further that Duramed would grant Solvay an exclusive license to market Cenestin in nearly all countries outside the United States and also that Duramed would grant Solvay an option to market another of its drugs, Verapamil SR, under a Solvay brand name.

acquired by Barr Pharmaceuticals at the end of 2001, also considered terminating the arrangement with Solvay.

In late 2001 and early 2002, the parties tried unsuccessfully to reach the broader alliance contemplated by the CPA. On March 29, 2002, Barr/Duramed gave Solvay written notice that it intended to terminate both the 1999 Cenestin Agreement, "as amended by the letter agreement dated January 27, 2000," and the related Estratest & Prometrium Agreement. Solvay filed an arbitration demand under the CPA in response. It sought damages for Duramed's alleged breach of the ten-year investment-recovery and profit-split arrangement under the Letter Agreement. As of the March 29 notification, Solvay had recovered only $47 million of the nearly $100 million it had spent in promotional costs.

In considering Solvay's claim, the arbitrators squarely confronted the central issue in this appeal: the applicability of the CPA's exclusive remedy/no damages provision to the January 27, 2000 Letter Agreement.[2] Duramed insisted, as it does now, that the Letter Agreement in no way affected the CPA's prohibition on damages, and that inasmuch as the arbitration panel's authority derived solely from the arbitration clause in the CPA (because the Letter Agreement had no such clause of its own), the panel had no jurisdiction to award damages by selecting some and rejecting other provisions of the CPA. Solvay offered three arguments in response, each of which it repeats on appeal: 1) the new agreements in the Letter Agreement—the loan guarantee and the profit-split—were separate agreements from the CPA and thus not subject to its terms; 2) assuming that the Letter Agreement amended the CPA, the parties intended to supercede the CPA's exclusive remedy/no damages provision; and 3) the exclusive remedy/no damages provision should not be read to bar damages because that would nonsensically require "termination" to be the only remedy for "default"—and when the default itself consisted of allegedly wrongful termination, "termination" would not be a remedy at all.

On June 16, 2004, a divided arbitration panel awarded Solvay $68 million in damages, apparently determining that the exclusive remedy/no damages provision did not apply to Duramed's breach of the Letter Agreement. The award was signed by two of the three arbitrators. The third, Arbitrator Mercurio, in a separate statement agreed that Duramed had breached the contract by terminating in mid-2002, but disagreed with the amount of the award on the grounds that "the $68-million damage award . . . far exceed[ed] any damages the evidence would support." On the issue of liability, Arbitrator Mercurio noted that while the one-year CPA provided for early termination without cause (subject to good faith and notice requirements), the Letter Agreement, with its extended term, monetary obligations for Solvay, and shifting profit-sharing structure, did not. Arbitrator Mercurio did not suggest that damages were prohibited under the Letter Agreement.

Solvay filed an application to confirm the arbitration award in district court. Duramed opposed confirmation and filed a motion to vacate the award. The District Court confirmed the award on September 22, 2004. This appeal followed.

II

Arbitration is a matter of contract, and the Federal Arbitration Act encourages parties to contract for arbitration by ensuring that arbitration awards are both fair and final. Finality is achieved by substantially limiting the occasions for judicial review, and fairness by requiring courts to intervene when arbitrators so improperly execute their responsibilities as to discourage others

---

[2]Though the arbitrator's award does not state explicitly that this issue was presented to the arbitrators, the District Court's Finding of Facts reports that it was. *See Solvay Pharm., Inc. v. Duramed Pharm., Inc.*, Case No. C-1-04-414 (S.D. Ohio 2004). Duramed does not claim otherwise on appeal.

from arbitrating in the future. The Act promotes arbitration by requiring both the inaction, and in select circumstances, the action of the federal courts.

Courts may vacate arbitration awards "where the arbitrators exceed[] their powers," 9 U.S.C. § 10(a)(4), the idea being that periodic judicial intervention promotes arbitration in the long run. More parties will contract for arbitration if they can tailor arbitration to their particular needs; and fewer will opt for arbitration if they cannot. (The full list of circumstances allowing for judicial intervention is contained in 9 U.S.C. § 10(a).[3]) We review de novo a district court's determination of whether an arbitration panel has exceeded its powers. *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 845 (6th Cir. 2003).

"The burden of proving that the arbitrators exceeded their authority is very great," *id.* at 846, and "courts must accord an arbitrator's decision substantial deference because it is the arbitrator's construction of the agreement, not the court's construction, to which the parties have agreed." *Beacon Journal Pub. Co. v. Akron Newspaper Guild, Local No. 7*, 114 F.3d 596, 599 (6th Cir. 1997). The terms of the contract define the powers of the arbitrator, and "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed a serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). "[C]ourts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious *legal* or factual error." *Id.* (emphasis added). And "[i]f a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Merrill Lynch, Pierce, Fenner & Smith v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995).

We follow the Supreme Court's oft-quoted guidance that "if the arbitrator's award 'draws its essence from the . . . agreement,' and is not merely the arbitrator's 'own brand of industrial justice,' the award is legitimate." *Beacon Journal Pub.*, 114 F.3d at 599 (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Co.*, 363 U.S. 593, 597 (1960)). And we have said that:

---

[3]9 U.S.C. § 10(a) reads:

In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
   (1) where the award was procured by corruption, fraud, or undue means;
   (2) where there was evident partiality or corruption in the arbitrators, or either of them;
   (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
   (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

In addition, courts have held that judicial intervention is appropriate where arbitrators act with "'manifest disregard of the law.'" *Jacada, Ltd. v. Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 712 (6th Cir. 2005) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)); *Wilko v. Swan*, 346 U.S. 427 (1953) (overruled on other grounds, *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989)). As discussed below, Duramed attacks the lawfulness of the arbitration award—specifically the lawfulness of how the arbitrators reconciled the CPA with the Letter Agreement. But it does not charge that such error was in "manifest disregard of the law" or discuss any of our cases articulating the doctrine. *See, e.g.*, *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 845 (6th Cir. 2003); *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000) ("An arbitration panel acts with manifest disregard if '(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle.'" (quoting *Merrill Lynch*, 70 F.3d at 421)); *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996).

An arbitrator's award fails to draw its essence from the agreement when:

> (1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on "general considerations of fairness and equity" instead of the exact terms of the agreement.

*Beacon Journal Pub.*, 114 F.3d at 600 (citations omitted).[4]

These formulations of § 10(a)(4) require the reviewing court to consider all provisions of the contract or collective bargaining agreement on parity—to view each clause of the contract, and its consistency with the arbitrator's award, as equally implicating the arbitrator's "powers." But at a prior stage of the analysis, courts must distinguish between contract provisions that concern "arbitrability"—*i.e.*, what sorts of disputes are proper subjects for arbitration—and those that do not. This distinction implies that arbitrators may exceed their powers either by misconstruing a contract provision in a dispute that was properly before them, or by engaging in an inquiry that was not properly arbitrable. And courts must show different degrees of deference to an arbitration panel's determination in each case:

> When a reviewing court is called upon to determine whether an arbitrator, in passing on a matter concededly within his jurisdiction, misconstrued the contract in question, great deference is appropriate; to use Justice Douglas' often-cited phrase, the award in such a case must be affirmed if it "draws its essence" from the governing agreement. [*United Steelworkers of Am.*, 363 U.S. at 597]. . . .
>
> Where, however, a party to an arbitration proceeding challenges the arbitrator's authority to decide a particular issue, the function of a reviewing court is distinctly different. The threshold question of arbitrability is one of law, and a reviewing court is obligated to make its own determination of the issue. *Mobil Oil Corp. v. Local 8-766*, 600 F.2d 322, 324-25 (1st Cir. 1979). The court's decision may, of course, be informed by the arbitrator's resolution of the arbitrability question, *id.* at 325, and . . . where the scope of arbitration is "fairly debatable" or "reasonably in doubt," the arbitrator's assumption of jurisdiction should be upheld. . . . *Butler Products Co. v. Unistrut Corp.*, 367 F.2d 733, 736 (7th Cir. 1966). Neither arbitrators nor courts, however, have the prerogative to redraft an arbitration clause to require parties to arbitrate matters that they did not initially agree to arbitrate. *Farkar Co. v. R. A. Hanson DISC, Ltd.*, 583 F.2d 68, 72 (2d Cir. 1978).

*Davis v. Chevy Chase Fin., Ltd.*, 667 F.2d 160, 167 (D.C. Cir. 1981). We thus inquire as a threshold matter whether a claim that arbitrators have exceeded their powers attacks the "arbitrability" of a particular matter, or merely the consistency of an award with the terms of a contract on a matter that is properly arbitrable. Upon concluding that the matter does concern "arbitrability," a court should show less deference to the arbitration panel's determination of its own "jurisdiction" than it does in the typical "draws its essence" analysis.

In fact, absent "clear and unmistakable" evidence that contracting parties intended an arbitrator (rather than a court) to resolve questions of arbitrability, courts "'should *independently* decide whether an arbitration panel has jurisdiction over the merits of any particular dispute.'" *First*

---

[4] *But see Mich. Family Res., Inc. v. SEIU Local 517M*, — F.3d —, 2006 U.S. App. LEXIS 2007, at *11 (6th Cir. Jan. 27, 2006) (Sutton J., concurring) (questioning the consistency of the four-part test with Supreme Court precedent).

*Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 941, 945 (1995) (quoting *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1509 (3d. Cir. 1994)).[5]  The Supreme Court has thus distinguished the question of "*who* (primarily) should decide arbitrability" from "*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement." *Id.* at 944-45 (quotations omitted).  The default answer to the first question is that questions of arbitrability are the province of courts, not arbitrators.  But when courts assess arbitrability (the second question), "'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).  Courts thus review questions of arbitrability de novo, but with a thumb on the scale in favor of arbitration.

The decision to apply either the more deferential "draws its essence" test or the less deferential "de novo plus *Moses H. Cone*" test depends upon whether the party challenging the award alleges that the arbitrators have violated a contract provision that concerns arbitrability.[6]  And whether a contract provision implicates arbitrability is a matter of contract, determined by the parties' intentions.  Courts may attempt to divine such intentions in various ways.  First, courts may consider the location of the targeted provision—*i.e.*, the limitation that the arbitrators allegedly violated—in the contract.  If the limitation appears in close proximity to the arbitration clause, there is good reason to believe that the parties considered it to be a limitation on the proper subjects for arbitration.  Alternatively, if the limitation appears nowhere near the contract's arbitration clause, there is reason to believe that the parties did not intend it to limit the proper subjects for arbitration.  Second, courts may engage in a functional inquiry.  They may ask whether the parties would have thought the particular limitation best adjudicated by a panel of industry experts, or rather whether more searching judicial review would likely have been preferable.  The ultimate question is whether the parties included the provision so as to "circumscribe [the] scope" of arbitration, *Farkar*, 583 F.2d at 72, or rather whether they intended it to define an aspect of the contractual relationship, in parallel with other arbitrable provisions of the contract.

### III

### A

The first question in this case is thus whether the CPA's exclusive remedy/no damages provision defined the scope of arbitrable matters under the CPA and subsequent agreements, or simply the *type of relief* that arbitrators were allowed to award in disputes under the CPA.  If the parties included the exclusive remedy/no damages provision because they did not wish damage questions to be arbitrable (or, in other words, because they did not wish to authorize arbitrators to even hear such matters), then the arbitrators' decision to award damages under the Letter Agreement would constitute an expansion of the scope of matters proper for arbitration, and we would determine de novo whether anything in the Letter Agreement itself justified that expansion.  If, on the other hand, the exclusive remedy/no damages provision simply announced that damages were not appropriate under the initial co-promotion arrangement, then the arbitrators' decision that damages were an appropriate remedy for breach of the Letter Agreement would not constitute an

---

[5]*Cf. United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 583 n.7 (1960) ("Where the assertion by the claimant is that the parties excluded from court determination not merely the decision of the merits of the grievance but also the question of its arbitrability, vesting power to make both decisions in the arbitrator, the claimant must bear the burden of a clear demonstration of that purpose.").

[6]Note that challenges to arbitrability can reach the federal courts in a variety of ways:  for example, as an attack on an arbitration award under 9 U.S.C. § 10(a), as here, or as in *First Options*, 514 U.S. at 941; or as a motion resisting a petition to compel arbitration under 9 U.S.C. § 4.  When the challenge occurs prior to the arbitration, there is no question that the issue is one of arbitrability, for no award yet exists to be challenged.

expansion of the scope of arbitrable matters. We would then apply the more deferential standard of asking whether the arbitrators' award, on a properly arbitrable matter, "dr[ew] its essence" from the agreement.

We understand Duramed to contend, in the alternative, that the exclusive remedy/no damages provision either limited the scope of arbitrable matters—such that this appeal presents a question of arbitrability—or simply stood as a contract provision that the arbitrators' award violated.[7],[8] At this stage, we consider the first possibility. Duramed insists that we review de novo the legal question of whether the arbitration panel could consider the issue of damages following Duramed's termination of the CPA and the Letter Agreement, because "to allow arbitrators to define the limits on their own authority" would render judicial review "a 'toothless' and hollow ritual." Appellant's Br. 14 (citation omitted). The fact that this may be a legal question does not itself require our independent review. *Cf. Beacon Journal Pub.*, 114 F.3d at 599 ("[C]ourts must refrain from reversing an arbitrator simply because the court . . . believes the arbitrator made a serious *legal* or factual error.") (emphasis added). But if it is a question of arbitrability, then, as noted above, *First*

---

[7]In fact, Duramed alternates between the two positions. It considers the "exclusive damages/no remedy" provision to be a "contractual limitation[] on [the arbitrators'] authority." *See* Appellant's Br. 13. But because "authority" is indistinguishable from "powers," and because arbitrators may exceed their powers *either* by fashioning an award that does not "draw its essence" from the agreement *or* by considering a matter that is not properly arbitrable, the term "authority" is ambiguous, and we seek to avoid it. At the outset of its argument, Duramed cites two propositions suggesting that the "authority" question in this case relates to arbitrability: "[A]rbitration . . . is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration," *First Options*, 514 U.S. at 943; "[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration," *AT&T Techs. Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648-49 (1986). *See* Appellant's Br. 13. But later, Duramed cites a litany of cases—including three to which it devotes significant attention, Appellant's Br. 15, 17-19—that relate not to arbitrability, but rather to whether arbitration awards, on matters properly arbitrable, violated provisions limiting the type of relief allowable under the agreements. Duramed refers to such provisions as "*limits* on the arbitrators' remedial authority." Appellant's Br. 20. While it is certainly true that such provisions do limit arbitrators' "authority" or "power" to award certain types of relief, they do not necessarily implicate the issue of arbitrability, and thus do not necessarily require de novo review by courts. *Cf. First Options*, 514 U.S. at 944-45 (absent "clear and unmistakable" language to the contrary, courts are to independently decide matters of arbitrability). We say "necessarily" because there may be cases in which a limitation on remedies is styled as a limitation on matters properly arbitrable, and our discussion in part III A examines whether this is such a case. Our discussion in part III B more closely parallels the cases that Duramed cites, and addresses whether the damage award to Solvay drew its essence from the contract.

[8]There is another way to look at Duramed's position. The arbitrators confronted several questions relating to the consistency of the CPA and the Letter Agreement: whether disputes relating to the Letter Agreement were arbitrable, since only the CPA contained an arbitration clause; whether Duramed's decision to terminate was sanctioned by the Letter Agreement, as it would have been under the CPA; and—the question that we address here—whether damages were allowed as a remedy for breaches of the Letter Agreement, given that (1) they would not have been under the CPA and (2) the Letter Agreement was silent on the issue. Duramed contends that we must address this last question de novo, without any deference to the arbitrators' decision. To see why this is tantamount to challenging the *arbitrability* of damages, we turn to the analysis in *First Options*:

> [C]onsider three types of disagreement present in this case. First, the Kaplans and First Options disagree about whether the Kaplans are personally liable for MKI's debt to First Options. That disagreement makes up the *merits* of the dispute. Second, they disagree about whether they agreed to arbitrate the merits. That disagreement is about the *arbitrability* of the dispute. Third, they disagree about *who should have the primary power to decide the second matter*. Does that power belong primarily to the arbitrators (because the court reviews their arbitrability decision deferentially) or to the court (because the court makes up its mind about arbitrability independently)?

514 U.S. at 942 (emphasis in original). The court held that absent clear contrary language in the contract, courts are to "make[ ]up [their] mind[s] about arbitrability independently." *Id*. Just so, Duramed wishes us to make up our mind independently, without deference to the arbitrators' conclusion, as to how to integrate the CPA and the Letter Agreement with respect to the exclusive remedy/no damages provision.

*Options* requires us to perform an independent review, absent clear contract language to the contrary.

It is worth noting briefly what is at stake in this inquiry. Duramed maintains that an independent review would show that the arbitrators exceeded their powers by considering the issue of damages. It contends that by operation of Ohio law, the exclusive remedy/no damages provision in the CPA extended forward to the Letter Agreement and was not "implicitly abrogated" by it. Specifically, Duramed points us to several Ohio cases holding that a contract amendment, or a subsequent agreement governed by an earlier contract, may implicitly abrogate an express provision of an earlier agreement only "to the extent that the two are contradictory," *Ottery v. Bland*, 536 N.E.2d 651, 654 (Ohio Ct. App. 1987), or only if the latter is "manifestly an abrogation of the former." *Starr Co. v. CBS*, 36 N.E.2d 861, 864 (Ohio Ct. App. 1941). Duramed thus asks us to determine de novo *how consistent* the Letter Agreement was with the CPA and to hold that since it is plausible to reconcile the two, the documents must be "harmonized" without expunging the exclusive remedy/no damages provision. Appellant's Br. 22-23. In other words, viewing Duramed's claim as a challenge to the arbitrability of damages questions, Duramed asks us to hold that the Letter Agreement did not abrogate the earlier limitation on the proper matters for arbitration.

Solvay sees things differently. It contends that we should defer to the arbitrators' determination that the exclusive remedy/no damages provision did not apply to breaches of the Letter Agreement, and thus, implicitly, it denies that the provision implicates a question of arbitrability. Solvay posits that "[t]he district court's decision confirming the Arbitrators' award must be affirmed if there is any plausible interpretation of the parties' agreements that would support the award." Appellee's Br. 23 (citing *Jaros*, 70 F.3d at 421 ("If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed.")). Specifically, Solvay would not have us ask whether the arbitrators' decision to limit the exclusive remedy/no damages provision to the CPA was "the *best* interpretation of the parties' agreement," but rather whether it was a "*plausible* interpretation." Appellee's Br. 24. This, however, would not be the proper test if we concluded that the exclusive remedy/no damages provision concerned arbitrability.

We view the exclusive remedy/no damages provision as not bearing on arbitrability, and accordingly we show substantial deference to the arbitrators' determination that the provision did not apply to breaches of the Letter Agreement. We believe instead that the exclusive remedy/no damages provision was a limitation on the relief that was appropriate for breaches of the CPA, and we believe that the arbitrators had the "primary power" to decide whether that limitation applied to breaches of the Letter Agreement. *First Options*, 514 U.S. at 942 (emphasis omitted).

The first indication that the parties did not consider the provision to be a limitation on the matters appropriate for arbitration is its location relative to the arbitration clause in the CPA, particularly given the breadth of the language used in the arbitration clause. The exclusive remedy/no damages provision appears as the last paragraph in Section 13, "Term and Termination," whereas the arbitration clause is the only item in Section 22, "Dispute Resolution." Had the parties wished categorically to withhold damage disputes from arbitration, they likely would have placed the two provisions in closer proximity. Moreover, Section 22 authorizes arbitration of "*[a]ny* dispute, controversy, or claim arising out of or relating to [the agreement]." (Emphasis added.) Had the parties intended the exclusive remedy/no damages clause to limit the proper *matters* for arbitration—as opposed to the relief appropriate under the CPA—they likely would have included some qualifying language.

The second indication is that the texts of the two provisions accommodate the possibility that damages would be allowed by a later agreement that established a different substantive arrangement between the parties. The exclusive remedy/no damages provision provides that "termination by one party shall be the exclusive remedy for a default by the other party under *this* AGREEMENT."

(Emphasis added.) Damages, however, might be expressly allowed by a later, related agreement, and disputes under that later agreement might be arbitrable under the CPA's arbitration clause as "arising out of or relating to" the original agreement. (Duramed presumably accepts this because it does not contend that there is no basis for arbitrating disputes concerning the Letter Agreement.) In that case, arbitrators empowered by the CPA's arbitration clause would be at liberty to assess damages. Thus if the exclusive remedy/no damages provision was—to use Duramed's term—a limitation on the arbitrators' "remedial authority," it was so only in the context of the CPA. Appellant's Br. 20. The arbitration clause, together with whichever other provisions defined the scope of arbitrable matters (if any), were sufficiently broad to authorize the arbitration of damages matters under subsequent agreements. Whether the Letter Agreement was such an agreement was thus not a question of arbitrability per se, but rather a question of what remedies were appropriate for that new arrangement—a matter well within the power of the arbitrators, rather than the courts, to decide.

The third indication that the exclusive remedy/no damages provision does not concern arbitrability is that even under the CPA, complex monetary awards were appropriate under certain circumstances. Section 4.3[9] provided that if the agreement expired as scheduled, or if—the parties not having replaced the CPA with a long-term agreement before June 30, 2000—one party terminated the CPA, Duramed was to pay Solvay every quarter for twenty quarters an amount equal to 5% of the "Duramed Gross Margin" for the quarter in which the CPA expired or the termination became effective. And Section 14.3 required Duramed to submit to Solvay a regular statement of its "Gross Margin." Since any disputes "arising out of" such provisions would have been arbitrable, arbitrators empowered by the CPA might have had to assess accountant reports on Duramed's costs and sales—much in the same way that damage calculations require. Arbitrators could not have awarded damages per se, but the fact that the CPA required them to assess monetary awards indicates that the parties considered them competent to do so. It rebuts the argument that the exclusive damages/no remedy provision concerned arbitrability because it limited arbitration to non-monetary matters.

Our finding that the exclusive remedy/no damages provision did not concern arbitrability means that we need not apply the rule from *Moses H. Cone*, that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," 460 U.S. at 24-25—though clearly

---

[9]Section 4.3 reads:

In the event that the AGREEMENT expires in accordance with the first sentence of Section 13.1 [relating to the CPA's term] or is terminated in accordance with Section 13.4, DURAMED shall pay [Solvay] a residual payment, as follows:

(a) during the next twenty (20) quarters after the effective date of expiration, equal quarterly installments which together shall total five percent (5%) of the DURAMED GROSS MARGIN for a calculated five (5) year period. Such payment shall be equal to the actual DURAMED GROSS MARGIN for the quarter of the calendar year in which the AGREEMENT expires or in which termination becomes effective multiplied by five percent (5%). Any such payment shall be fully creditable against any payments which DURAMED may owe [Solvay] in the event that the parties enter into a subsequent agreement in accordance with Paragraph 13.5 [giving Solvay rights of first refusal over co-promotion rights in the event the CPA expires or is terminated] and shall be subject to suspension or termination due to an event of force majeure as defined in Article 11.

the rule would only support our conclusion.[10]   Instead, we move on to decide whether the arbitrators' award drew its essence from the CPA and Letter Agreement.  We find that it did.

B

As noted above:

An arbitrator's award fails to draw its essence from the agreement when:

> (1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on "general considerations of fairness and equity" instead of the exact terms of the agreement.

*Beacon Journal Pub.*, 114 F.3d at 600.  Of these, the second and the fourth are inapplicable because the damage award imposed no requirements and because the arbitrators gave no indication that their award was motivated by considerations of fairness.  The first is similarly unhelpful, because the Letter Agreement was silent on the issue of remedies and the CPA's exclusive remedy/no damages provision did not expressly pertain to future agreements.  Certainly there is a question of whether the exclusive remedy/no damages provision could be read as not applying to the Letter Agreement (given the latter's silence), but we consider this to implicate the third consideration—namely, whether the award was "rationally supported by or derived from the agreement." *Id*.  In this inquiry, also as noted above, "[i]f a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Jaros*, 70 F.3d at 421.

Solvay identifies three (it contends) plausible interpretations of the CPA and the Letter Agreement sufficient to support the arbitrators' award:  first, that the Letter Agreement "contained new and independent undertakings, which were not subject to the termination and exclusive remedy/no damages provisions of the earlier CPA," Appellee's Br. 24-25; second, that the Letter Agreement, viewed as an amendment to the CPA, might have limited (or "trumped") the termination and exclusive remedy/no damages provisions of the CPA; and third, that Duramed's interpretation of the exclusive remedy/no damages clause renders it nonsensical.  Solvay insists that since the arbitrators' award would be consistent with any of these interpretations, the award must not be upset by this court.

We would characterize Solvay's suggested readings slightly differently, and in a way that better exposes the deficiencies in Duramed's responses.  The first possibility, that the Letter Agreement contained "new and independent undertakings," is simply a suggestion that the exclusive remedy/no damages provision *by its own terms* did not reach the arrangement struck in the Letter Agreement—and did not limit the appropriate remedies thereunder.  The second possibility, that the

---

[10] *Cf. Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005):

> This Court has drawn a clear line between the extensive applicability of general arbitration provisions and the more narrow applicability of arbitration clauses tied to specific disputes. When faced with a broad arbitration clause, such as one covering *any* dispute arising out of an agreement, a court should follow the presumption of arbitration and resolve doubts in favor of arbitration. *See Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004) [quoting *Moses H. Cone*, 460 U.S. at 24-25]. Indeed, in such a case, "only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration, will remove the dispute from consideration by the arbitrators." *Id.* at 627 (internal quotation marks and citation omitted). However, when an arbitration clause by its terms extends only to a specific type of dispute, then a court cannot require arbitration on claims that are not included. [*See Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)].

Letter Agreement "trumped" the exclusive remedy/no damages provision, accepts that the relevant provisions of the CPA originally did control the remedies that would be appropriate under a later document like the Letter Agreement, but insists that such provisions were amended by the mutual assent of the parties as expressed in the second document. Solvay's third suggestion, that Duramed's reading of the exclusive remedy/no damages provision renders it nonsensical, is just a variant of the first. It contends that under the only plausible reading of the exclusive remedy/no damages provision, the provision would not prohibit damages as a remedy for the breaches of the Letter Agreement.

We find first that the "new and independent undertakings" theory is supported by the CPA's terms. As noted above, the exclusive remedy/no damages provision pertains only to "*this* AGREEMENT" (emphasis added)—*i.e.*, the CPA.[11] Since the relevant provisions of the Letter Agreement were not part of the CPA, the exclusive remedy/no damages provision did not reach them, and the arbitrators were free to award Solvay damages.

Duramed resists this conclusion, responding that the Letter Agreement—in its entirety—amended the CPA, and thus formed a part of the same "agreement." But only one provision of the Letter Agreement, extending the term of the CPA to ten years, clearly amended the first agreement; the provisions relevant to this dispute did not. The Letter Agreement did speak of an "extended and enhanced alliance" between the two companies, but that alliance could have encompassed multiple "agreement[s]," not all of which would have been subject to all of the provisions of the CPA. And just because disputes regarding the Letter Agreement are arbitrable under the CPA's broad arbitration clause does not mean that the arbitrators were required to find that all of the provisions of each formed part of the same "agreement." The CPA's arbitration clause refers to disputes "*arising out of* or *relating to* [the CPA]" (emphasis added), which the arbitrators reasonably could have concluded to include disputes outside of the CPA's notion of "agreement." Thus the arbitrators reasonably could have concluded that provisions of the Letter Agreement were not implicated by the exclusive remedy/no damages provision in the CPA, but were nonetheless arbitrable under the broader arbitration clause. In awarding damages for Duramed's violation of such provisions, arbitrators would not have exceeded their powers. That is a sufficient basis upon which to uphold the decision of the district court.

We also find that Solvay's second theory, that the Letter Agreement amended and limited the exclusive remedy/no damages provision, offers an alternative basis. That is, stipulating that the Letter Agreement formed part of the same "agreement" for purposes of the exclusive remedy/no damages provision as it was originally written, the arbitrators might reasonably have concluded that the parties intended through the Letter Agreement to amend the provision to allow for damages. In fact, reconciling the two documents, determining which of the CPA's provisions were or were not modified by the Letter Agreement, was one of the arbitrators' core responsibilities. For example, as Solvay notes, Section 13.4 allowed either party to terminate if a long-term agreement was not executed by June 30, 2000, and the arbitrators, in finding Duramed liable for breach, implicitly found that Section 13.4 was superceded by the ten-year term in the Letter Agreement. We hold that the arbitrators similarly could have found the CPA's exclusive remedy/no damages provision limited by the Letter Agreement. Much of the testimony before the panel concerned the circumstances

---

[11]In fact, the "exclusive remedy" clause contains the phrase, "this AGREEMENT," but the "no damages" clause does not. We nonetheless read the phrase to apply to both. Granted, if the provision read, "Under this AGREEMENT, termination by one party shall be the exclusive remedy for a default by the other party and, except as expressly provided herein, neither party shall have any liability for damages to or lost profits of the other, direct or consequential," then "this AGREEMENT" (the CPA) clearly would have applied to both the "exclusive remedy" and the "no damages" clauses. That it does not so read is of no moment. To understand "this Agreement" as only applying to the "exclusive remedy" clause would drain any limitation—of time or circumstance—from the "no damages" clause. We reject this reading as implausible.

surrounding the execution of the two documents and how the arrangement established by the later document departed from that established by the first—including the longer term, the financial risk borne by Solvay, and the shifting profit-sharing arrangement as compared to the "cashless" original deal. Considering such evidence, and in light of the Letter Agreement's silence on the issue of damages, the arbitrators reasonably might have concluded that the parties executed the Letter Agreement with the belief that the exclusive remedy/no damages provision would not apply to it, and that damages might be an appropriate remedy for breach. We hold accordingly that the district court did not err in concluding that the panel did not exceed its powers in awarding damages.

Duramed, in response, would direct us back to the Ohio contract law principle that "[a]s a matter of law, a[] [contract] amendment can implicitly abrogate an express contractual provision *only* 'to the extent the two are contradictory.'" Appellant's Br. 22 (quoting *Ottery*, 536 N.E.2d at 654). We noted before that because the exclusive remedy/no damages provision does not concern arbitrability, courts are not to engage in an independent review of how contradictory (or how consistent) are the express contractual provision and the amendment. We now hold that, as applied to the facts here, a more deferential review gives no occasion to upset the arbitrators' construction of the two documents. We do not deny that Ohio contract law governs how the arbitrators should have constructed the documents, or specifically how contradictory the Letter Agreement had to be to the exclusive remedy/no damages provision to justify narrowing the latter. But courts must defer to an arbitration panel's interpretive determinations of even legal questions, particularly where the legal standard requires as fact-bound an inquiry as determining the consistency of various contract documents. In this case, the arbitration panel would have wanted to know how typical such damages remedies are in financial arrangements of the sort created by the Letter Agreement. And it would have wanted to know how often parties that intend to authorize damage awards neglect to include express provisions to that effect. Given the myriad considerations that could have demonstrated the exclusive remedy/no damages provision to be contradictory to the Letter Agreement, we consider the arbitrators' decision to limit the applicability of the exclusive remedy/no damages provision to have been plausibly within Ohio law. We are unable to find that the arbitrators so improperly constructed the CPA and the Letter Agreement as to have exceeded their powers, and accordingly we affirm the decision of the district court.

We choose not to scrutinize Solvay's third theory as to how the arbitrators reasonably might have interpreted the CPA and the Letter Agreement to allow for their damage award. As noted, the third suggestion is a variant of the first, and the first and the second each suffice to sustain the arbitration award and the district court's decision.

IV

We find that the arbitrators did not exceed their powers by awarding damages to Solvay in this dispute. We accordingly affirm the judgment of the district court.