**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0767n.06
Filed: December 17, 2008

**Nos. 07-6422/08-5191**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

MARTIN MARIETTA MATERIALS, INC., )
           )
  Plaintiff-Appellant, )
           )
v. ) ON APPEAL FROM THE UNITED
           ) STATES DISTRICT COURT FOR THE
BANK OF OKLAHOMA, ) WESTERN DISTRICT OF KENTUCKY
           )
  Defendant-Appellee. )
           )

Before: BATCHELDER, GILMAN and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Martin Marietta Materials challenges the district court's confirmation of an arbitration award in favor of the Bank of Oklahoma. We affirm.

I.

Martin Marietta leases and operates a quarry, known as the Three Rivers Quarry, which is held in trust and managed by the Bank of Oklahoma. One of the terms of the lease requires Martin Marietta to pay royalties on limestone removed from the Three Rivers Quarry. After setting the price for the two operative royalties—a base-rate royalty and a production-incentive royalty—for initial terms, the lease provides for a yearly adjustment to the base royalty and a decennial adjustment to the base and incentive royalties.

In connection with the ten-year adjustment to the royalties, the lease requires the two parties to "commence good faith negotiations to determine a proper and equitable increase or decrease" in

the base and incentive royalties. JA 239. If the parties fail to agree on new royalties, they must "resolve any and all outstanding issues" through arbitration. JA 240. Under the lease, the parties use a form of arbitration familiar to baseball fans, by which each party submits proposed base and incentive royalties, and the arbitrator "select[s] the proposal of the party which he believes most accurately represents the correct finding(s) of fact." JA 243. The arbitrator, the lease adds, may not "effect a compromise" in handling this process but must pick one proposal or the other for each royalty. JA 243–44.

When the most recent ten-year adjustment occurred, Martin Marietta and the Bank of Oklahoma came to an impasse about how to adjust the two royalties, prompting the Bank of Oklahoma to invoke the arbitration clause. After hearing from the parties and after considering their proposed adjustments, the arbitrator adopted the bank's proposed base and incentive royalties. Unhappy with the decision, Martin Marietta filed a complaint in federal district court seeking to vacate or modify the arbitration award under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, after which the Bank of Oklahoma asked the court to confirm the arbitration award. The court confirmed the award.

II.

Under the Federal Arbitration Act, a district court may vacate an arbitration award for any of the following reasons:

(1)     where the award was procured by corruption, fraud, or undue means;

(2)     where there was evident partiality or corruption in the arbitrators, or either of them;

2

(3)     where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)     where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

Martin Marietta does not argue that any of the first three grounds apply. In arguing that we should vacate the award on the basis of the fourth ground—that the arbitrator "exceeded [his] powers" or "so imperfectly executed them"—Martin Marietta invokes two related lines of cases. One of them arises under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and deals with federal-court challenges to arbitration rulings that grow out of the collective-bargaining process. *See, e.g.*, *Mich. Family Res., Inc. v. Serv. Employees Int'l Union Local 517M*, 475 F.3d 746 (6th Cir. 2007) (en banc). The second line of cases arises directly under the Federal Arbitration Act.

The parties make two assumptions in debating the application of these precedents to this dispute. They first assume that the labor-arbitration line of cases applies to arbitration awards controlled by the Federal Arbitration Act and that the two standards are roughly the same. That may well be an appropriate assumption: "[F]ederal courts have often looked to the Act for guidance in labor arbitration cases," *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 40 n.9 (1987), and panels of this court have suggested that labor-arbitration cases govern disputes under the Federal Arbitration Act, *see, e.g.*, *Solvay Pharms., Inc. v. Duramed Pharms., Inc.*, 442 F.3d 471, 476 (6th Cir. 2006); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005). The parties also assume that the "manifest disregard" standard remains a valid ground for vacating an

arbitration award under the Federal Arbitration Act after the Supreme Court's decision in *Hall Street*

*Associates, LLC v. Mattel, Inc.*, __ U.S __, 128 S. Ct. 1396 (2008). That, however, may not be true,

at least if the following passage from *Hall Street* is any indication:

> Maybe the term "manifest disregard" [in *Wilko v. Swan*, 346 U.S. 427, 436 (1953)] was meant to name a new ground for review, but maybe it merely referred to the § 10 grounds collectively, rather than adding to them. Or, as some courts have thought, "manifest disregard" may have been shorthand for § 10(a)(3) or § 10(a)(4), the subsections authorizing vacatur when the arbitrators were "guilty of misconduct" or "exceeded their powers."

*Id*. at 1404 (internal citations omitted). Since *Hall Street*, two of our sister circuits have suggested

different answers to the question whether the "manifest disregard" standard retains continuing

vitality. *Compare Ramos-Santiago v. United Parcel Serv.*, 524 F.3d 120, 124 n.3 (1st Cir. 2008),

*with Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, __ F.3d __, 2008 WL 4779582, at *7–8 (2d Cir.

Nov. 4, 2008).

For present purposes, we will resolve the dispute as the parties have presented it to

us—namely, with the assumptions that the framework of the labor-arbitration cases applies here, that

the "manifest disregard" standard continues to apply to cases under the Federal Arbitration Act and

that the two standards are roughly the same. We simply acknowledge each assumption in order to

allow future panels and litigants to choose for themselves whether to challenge these premises or

to continue to walk down the same calf-path as we have. *See* Sam Walter Foss, *The Calf-Path,* in

*Whiffs from Wild Meadows* 77, 77–80 (1895).

Our scope of review in this area is not congenial to parties disappointed by the merits of an

arbitration ruling. In the context of labor-arbitration decisions, we consider these questions:

> Did the arbitrator act "outside his authority" by resolving a dispute not committed to arbitration? Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? And in resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying the contract"? So long as the arbitrator does not offend any of these requirements, the request for judicial intervention should be resisted even though the arbitrator made "serious," "improvident" or "silly" errors in resolving the merits of the dispute.

*Mich. Family Res.*, 475 F.3d at 753.

In the context of cases arising under the Federal Arbitration Act, as delineated above, we likewise focus on procedural irregularities in the arbitration process, the one caveat being the "very narrow" exception for arbitration rulings that "manifest[ly] disregard" the applicable law. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995).

When it comes to the merits of an arbitration decision, which is all that Martin Marietta challenges here, the question is not whether the arbitrator correctly construed the contract; it is whether he was "arguably construing or applying the contract," a requirement that most arbitration decisions will readily satisfy save for the rare situation where the decision is "so untethered to the terms of the agreement . . . that it would cast doubt on whether the arbitrator indeed was engaged in interpretation." *Mich. Family Res.*, 475 F.3d at 753 (internal quotation marks omitted). "[I]n most cases, it will suffice to enforce the award that the arbitrator appeared to be engaged in interpretation, and if there is doubt we will presume that the arbitrator was doing just that." *Id*.

Measured by these modest requirements, this award must be confirmed. By all visible measures, the arbitrator was engaged in interpretation. He wrote a 21-page opinion that "refers to, quotes from and analyzes the pertinent provisions of the agreement." *Id.* "[A]t no point does he say anything indicating that he was doing anything other than trying to reach a good-faith interpretation

of the contract." *Id.* And the format of this arbitration, at any rate, left little for the arbitrator to interpret. Recall that the arbitration format agreed to by the parties requires the arbitrator to pick one proposed incentive royalty or the other, generally leaving little room for construction of the lease (save for clearly defined caps on royalty increases) and no room for "compromise" awards.

Nor is there any tenable basis for concluding that the incentive royalty picked by the arbitrator was "so untethered to the terms of the agreement . . . that it would cast doubt on whether the arbitrator indeed was engaged in interpretation." *Mich. Family Res.*, 475 F.3d at 753 (internal quotation marks omitted). The operative provision of the lease places just two limits on base and incentive royalties, and neither of them precludes this award. The first limit establishes a percentage cap on increases or decreases to the base royalty, providing that it shall never be "more than twenty percent (20%) higher or lower" than the base royalty paid during the previous year. Yet Martin Marietta does not challenge the base royalty picked by the arbitrator. The second limit establishes a floor for the base and incentive royalties. JA 240. Yet the incentive royalty picked by the arbitrator easily surpasses the minimum amount named in the amendment. *See* JA 240 (creating a minimum incentive royalty of $0.10 per ton); *compare with* JA 33 (selecting an incentive royalty of $0.417 per ton). As the arbitrator correctly noted, the lease "contain[s] no other restriction or limitation concerning the adjustment of the [incentive royalty]," JA 16, and thus provides no basis for saying that the arbitrator lost his way in picking this incentive royalty and effectively labeled something white when it was black.

To the extent the arbitrator considered extrinsic evidence in determining a "proper and equitable royalty rate," JA 21 (internal quotation marks omitted), the lease gave him authority to do so. Under the lease, the parties have wide latitude in negotiating adjusted royalty rates "according to the then prevailing market conditions *considering all relevant facts and circumstances*," JA 240 (emphasis added), and they are charged with "determin[ing] a proper and equitable increase or decrease" in the incentive royalty, JA 239.

Martin Marietta principally challenges the award on the ground that the arbitrator's interpretation ignores the "plain and unambiguous" meaning of "production incentive royalty." Br. at 18–19. Above all, Martin Marietta urges, an incentive royalty that is greater than the base royalty "does not reward increased productivity" and therefore "cannot, *by definition*, be a production incentive." Br. at 13. But it is not that simple. The lease conspicuously places limits on the percentage by which a royalty may increase or decrease from the prior year and conspicuously places limits on the minimum incentive royalty, and yet it contains no requirement mandating that the incentive royalty not exceed the base royalty. That silence allowed the arbitrator to consider both proposed incentive royalties, not just Martin Marietta's.

Nor is it by any means clear that a production-incentive royalty will never exceed the price of a base royalty. At the arbitration hearing, one of the experts testified "that production incentive royalties are present in [other, similar long-term] leases . . . and that in some instances, the production incentive royalty increases as production increases," JA 25, and that "an incentive to produce limestone" exists even with the new rate. JA 28. And we can imagine why both observations could be true. The owners of a quarry may be as interested in ensuring the long-term

7

viability of a quarry as they are in the short-term incentive to mine more limestone. And market rates for limestone, something the agreement allowed the parties and arbitrator to consider in modifying the royalties, could become sufficiently high that Martin Marietta retained ample incentive to mine the limestone even when the incentive royalty exceeded the base royalty. It may be that some, or even most, incentive royalties will lower the price as production increases, but Martin Marietta has not established that this will always be so, no matter the industry, no matter the parties' past practices, no matter the market prices, and it thus has not shown that this award is so divorced from the terms of the underlying agreement as to call into question the arbitrator's professed effort to interpret and apply it. That is particularly so here since the parties chose not to define production-incentive royalties, something they readily could have done had they wished to tie the arbitrator's hands on this point.

In separately arguing that the arbitrator acted in "manifest disregard of the law," Br. at 14, Martin Marietta maintains that the arbitrator knew about but ignored Kentucky law "requiring him to give effect to 'all parts and every word'" in the Lease Agreement. Br. at 27 (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384–85 (Ky. Ct. App. 2002)). But as we have shown, the arbitrator did not exceed any clear restrictions on his discretion, and the testimony showed that a "production incentive royalty" may permit the price paid by the lessee to go up as production goes up. Even if that were not the case, however, it would at most show "[a] misinterpretation of the contracts," which "will not, in itself, vitiate the award" under the "manifest disregard" standard, *Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 866 (6th Cir. 1990).

IV.

For these reasons we affirm.